## James F. Brown, Appellant, v. The German-American Title & Trust Company of Philadelphia.

*Contract—Assignment of building contract—Principal and agent—Master and servant—Wages.*

A contractor agreed in writing on June 3, 1893, to give his surety a " full assignment " of a building contract, to be held by the surety as collateral security for moneys loaned and to be loaned to him by the surety. It was also specified that the moneys advanced and moneys paid on account of the contract should be deposited with the surety to be paid out only on account of notes specified in a list furnished to the surety, and "in payment of sums advanced on account of bills outstanding for materials and work and labor done " under the contract, and " in payment of bills and claims contracted for, or that may be contracted for, materials furnished or to be furnished and work done or to be done in or about each and every of said contracts, including the weekly pay-roll of said contractor and $50.00 weekly to cover his living expenses." It was further specified that the funds deposited should be and remain a trust fund, and that the contractor should have no property therein until his outstanding indebtedness and the expense of completing the contract, and the advances should be paid. The contractor received but one payment from the owners after the date of this agreement, and this he deposited with the surety. About a month afterwards he made an absolute assignment of the contract to the surety, and bound himself to supervise the work without charge. Subsequently he made a general assignment for the benefit of his creditors. The owners refused to recognize the absolute assignment of the surety, but permitted the surety, as surety, to carry on the work. In an action of assumpsit against the surety for wages for work done from June 3, 1893, until July 18, 1893, it appeared that plaintiff had no knowledge of the agreement of June 3, 1893. *Held*, (1) that the facts of the case did not fix upon the surety as an undisclosed principal in the prosecution of the work subsequent to June 3, 1893, a liability for plaintiff's services under the contractor's employment from that date; (2) that the facts did not show an undertaking on the part of the surety with the contractor to pay the plaintiff after June 3, 1893, which the plaintiff might enforce directly against the defendant; (3) that the funds deposited with the surety in pursuance of the agreement of June 3, 1893, were not, to the extent of plaintiff's wages accruing subsequently thereto, moneys had and received to his use, and therefore recoverable by him from the surety in an action of assumpsit; (4) that there was no lien on the fund in the surety's hands in favor of the plaintiff under the act of April 9, 1872, P. L. 47, as amended by the acts of June 13, 1883, P. L. 116, and May 12, 1891, P. L. 54.

**444**     BROWN, Appellant, v. TITLE & TRUST CO.

Argued March 2, 1896.   Appeal, No. 168, Jan. T., 1895, by plaintiff, from judgment of C. P. Berks Co., Dec. T., 1893, No. 31, for defendant non obstante veredicto.   Before GREEN, McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Affirmed.

Assumpsit for wages.

The facts appear by the opinion of the court below, END-LICH, J., which was as follows :

The peculiar importance of this case consists in the fact that there are about a hundred others pending which will be controlled by the principles decisive of this.   At the conclusion of the testimony upon the trial, there being no facts whatever in dispute, a verdict was, by agreement of counsel, directed for plaintiff subject to the opinion of the court upon the questions of law raised by defendant's points, which were reserved.   It may be that some of these points were not technically such as to warrant their reservation, had their form been objected to : see Heany v. Schwartz, 155 Pa. 154.   The point, however, alleging that " there is no evidence in the case showing any liability on the part of the defendant to the plaintiff " was sufficient, under Chandler v. Ins. Co., 88 Pa. 223, and Koons v. Telegraph Co., 102 Pa. 164 ; and fairly raises every question involved. I confess that I have labored to find some way in which to sustain the verdict consistently with recognized legal principles— appreciating as I do the unfortunate situation, at this time, of the mechanics and workmen who are kept out of the wages of their toil.   But I cannot get away from the objection that their rights cannot be worked out in this form of action, whatever remedy there may be presently or hereafter available to them.

The facts of the case are as follows : Under authority conferred upon the governor by the act of June 22, 1891, P. L. 379, a commission was appointed to select a site and build an asylum for the accommodation of the chronic insane of the state, the sum of $500,000 being put at the disposal of said commission for the purpose by section 6 of that enactment.   A site in the neighborhood of Wernersville, this county, having been selected and acquired, the commission, on July 12, 1892, entered into a contract with one Amweg, whereby the latter, in consideration of the promised sum of $304,121.22, agreed to erect the necessary and specified buildings by October 1, 1893.   Pay-

ments were to be made to him monthly upon estimates rendered by him and approved by the commission's architects of the work done and materials placed and used in the construction of said building; the commission to retain twenty per cent of said monthly estimates until satisfactory completion of the work within the time fixed, and the presentation by the contractor of releases from subcontractors. Paragraph 8 of this contract forbade its assignment or transfer by Amweg without the written assent of the commission. The defendant became Amweg's surety for the performance of his undertaking. In order to enable him to complete the same, the defendant, at various times during the year 1893, prior to June 3, advanced him, upon his notes, sums aggregating $18,000. On that date there remained owing by him to defendant $16,000 and the latter agreed to furnish $12,000 more, Amweg executing an instrument agreeing to give the defendant " full assignment of five several contracts," including that of July 12, 1892, " to the end that said contracts, together with the benefits to be derived therefrom, . . . . may be held by said company as collateral security for the moneys so loaned and agreed to be loaned ; " and further agreeing " that the money to be advanced as aforesaid, as well as all and every payment made on account of each and every of said contracts, shall be deposited with the said German-American Title and Trust Company, to be paid out only on account of the notes mentioned and set forth in the list of bills payable heretofore furnished to said company by the said Amweg, and in payment of sums advanced on account of bills outstanding for materials and work and labor done towards the erection of either of the five buildings, the subject-matter of said five contracts and notes and in payment of bills and claims contracted for, or that may be contracted for, materials furnished or to be furnished, and work done or to be done in or about each and every of said contracts, including the weekly pay rolls of said Amweg and $50.00 weekly to cover his living expenses," he to furnish previously to the drawing of a check, a requisition showing what the money is to be applied to, and acquittances for previous payments weekly and whenever called upon by defendant's officers. " Said funds," the instrument proceeds, " thus to be deposited, though to be drawn upon for the purposes aforesaid, shall be and remain a trust fund ; no property

therein in the said Amweg whatsoever," until his outstanding
indebtedness and the expense of completing the five contracts,
together with $2,000 " for the services of the officers and clerks
of said company entailed in carrying out the foregoing details,"
and the advances made to him by the defendant, with interest,
shall have been fully paid, when any balance remaining shall
be transferred to " Amweg, his heirs and assigns." After this
date Amweg received but one payment from the commission,
which he deposited with the defendant. His checks were
countersigned by one of its officers. He drew no part of the
weekly sum reserved for him personally. The arrangement of
June 3, 1893, does not appear to have been known to plaintiff
or others dealing with Amweg. The money furnished him by
defendant under it proved ineffectual to keep him upon his feet.
About a month thereafter, finding himself obliged to make a
general assignment for the benefit of his creditors, he executed
another instrument, bearing, however, the same date of June 3,
1893, absolutely assigning to defendant his contract of July 12,
1892, " together with all powers, rights, privileges, benefits
and emoluments in said contract contained, and all the sub-
contracts," and " with full power . . . . to take possession of the
grounds and materials . . . . and perform . . . . said contract,"
and in his, Amweg's name, " to ask for, demand and collect
. . . . all moneys now due or that may hereafter become due
and payable under and by virtue of said contract ; " and binding
himself, without charge, to supervise the progress of the work,
and to hold any moneys he might receive in trust for the de-
fendant. On July 11, 1893, Amweg made an assignment
for benefit of creditors. The commissioners refused to re-
cognize the transfer of the contract of July 12, 1892, to the
defendant, but permitted the latter, as Amweg's surety, to take
up the work where he left it, with a view to completing it under
said contract, provided a person satisfactory to them be placed
in charge of it. Such a person having been agreed upon, the
defendant took charge of the work and possession of the tools
and materials found on the place about August 1, 1893. The
amount paid Amweg in June upon his estimate for May, and
deposited by him with defendant under the agreement of
June 3, 1893, was $9,096.03. Of it there is some evidence to
show that $1,000 were credited upon his loans from the defend-

ant. The balance was checked out by him in payment of work and materials. On September 1, 1893, defendant received from the commission $11,180.39 upon estimate for work, etc., during June and July, which it appropriated to the payment of such material-men as it chose to pay, or rather was obliged to satisfy, in order to insure a continuance of supplies under existing contracts. Before receiving that amount it had spent $11,017 in similar payments remaining due by Amweg. At the time of the trial it was still carrying on the work and had advanced about $25,000 more than it had received from the commissioners.

The plaintiff was engaged by Amweg as a carpenter at the Wernersville buildings on May 23, 1893, at 27½ cents per hour, and continued to work there until July 18, 1893. His claim is for unpaid wages from June 3. The question is, can he, under the above state of facts, recover against the plaintiff in this action?

This is an action of assumpsit. There is no pretense of an express contract directly between plaintiff and defendant. However true under our practice the dictum of Lord MANSFIELD has become, that " the action of assumpsit is a bill in equity ; " see Chambers v. Calhoun, 18 Pa. 13, 14, it is nevertheless equally true that it cannot be maintained wherever a bill in chancery will lie : Finney v. Finney, 16 Pa. 380. Privity of contract is indispensable to its maintenance : Finney v. Finney, 16 Pa. 380 ; Blymire v. Boistle, 6 W. 182 ; Morrison v. Beckey, 6 W. 349. The plaintiff seeks to deduce this privity from the facts detailed upon the theory (1) that they fix upon defendant as an undisclosed principal in the prosecution of the work at Wernersville subsequently to June 3, 1893, a liability for plaintiff's services under Amweg's employment from that date ; (2) that they show an undertaking on the part of defendant with Amweg to pay the plaintiff and others after June 3, 1893, in the employ of Amweg in that work, which the plaintiff may enforce directly against the defendant ; and (3) that the funds deposited with the defendant in pursuance of the agreement of June 3, 1893, were to the extent of plaintiff's wages accruing subsequently thereto, moneys had and received by it to his use, and therefore recoverable by him from it in this action. I shall not advert to the narrowness of his declaration, except to say that its deficiencies might, if the facts shown disclosed a cause of action in

assumpsit, still be cured by amendment, under act of March 14, 1872, P. L. 25 ; Bolton v. King, 105 Pa. 78. I shall consider the question whether there is any evidence warranting the inferences contended for by plaintiff in the order above indicated.

(1) Granted that the agreement of June 3, 1893, to assign is to be treated as a present assignment, upon the principle that equity considers that as done which a chancellor would decree to be done,—Lant's App., 95 Pa. 279 ; and see Wallace's App., 104 Pa. 559 ; Collins's App., 107 Pa. 590,—it is clear that it can be treated as a present assignment only to the extent and for the purposes to and for which it evidences an intention and imposes an obligation to assign. Being an undertaking to assign certain contracts, etc., as collateral security for a specified debt, the agreement of June 3, 1893, is, at most, to be treated as a present assignment as collateral security for that debt, with such rights of possession, control and management as the agreement retains to Amweg, and not as an absolute assignment. In either aspect its competency as between the parties to it and the commission, under paragraph 8 of Amweg's contract with the latter, is, as an abstract question, irrelevant, because no rights of the commission are here involved. Now, an undisclosed principal is not a creature of legal magic, nor is there anything mysterious about the doctrine of one's liability as such. It rests upon the ordinary principles applicable to the relation of principal and agent : Perkins v. Huntingdon, 19 N. Y. Supp. 71, 72.

Where that relation exists, in fact, he whom it designates as the principal is bound to the contracts made by him whom it designates as the agent, though the existence of the relation be unknown to the person contracting with the latter : Iron & Coal Co. v. Smith, 66 Pa. 340. Where that relation does not exist in fact, there can be neither agent to bind nor undisclosed principal to be bound. Thus A employed B to conduct a grocery business in his own name, but with the property and for the benefit of A, between whom and B there was a secret understanding that B should not bind A by any purchases he should make upon credit; it was held A was liable as principal for a purchase upon credit made in the business by B : Hubbard v. Tenbrook, 124 Pa. 291. Again, B conducted a distillery business, which he. sold to A, who, in turn, employed B to remain

as his manager; the business was thereupon conducted for A by B, without any change in its business name; A was held liable as principal upon contracts made by B for supplies: McCracken v. Hamburger, 139 Pa. 326. Again, A had a claim against B, and, knowing B to be insolvent, authorized him to buy wool, expressly agreeing to furnish the money to pay for it, the wool to be consigned to A, who was to sell it and after deducting expenses, commissions and costs, to credit B with the balance; B bought wool of C, who supposed himself to be dealing with B alone; A received and sold the wool, and without paying for it credited B on his indebtedness with the net proceeds, but without deducting costs; it was held that B was A's agent sufficiently to charge A: Thomas v. Moody, 57 Cal. 215. On the other hand, a creditor who advanced to an insolvent debtor the means of continuing his business, with a view of eventually seeing it put upon a paying basis or sold to some purchaser, and who was consulted as to some details in the subsequent management of the business, was held thereby not to make himself liable as an undisclosed principal for goods furnished directly to the debtor: Perkins v. Huntington, supra (N. Y. Supp. Ct., Gen'l T., 1st Dep't). The distinction between these cases is obvious. In the first three the persons held as principals were the real owners of the business and of the goods bought, or the complete masters of both, and those treated as agents were their employees in fact, acting for them and for their benefit, whether they were paid by wages as such or by a share of the proceeds was immaterial, just as it was immaterial whether the parties denominated themselves principals and agents or not. In the fourth case the relation between the insolvent and the person sought to be held as his principal was that of debtor and creditor, and though the purpose of the latter in throwing good money after bad was to bring about an event, from which a resulting benefit would flow to him, and though because of the magnitude of his stake his advice was sought in the management, he did not become the beneficial owner of the business and therefore could not be supposed to have assumed any pecuniary responsibilities in connection with its conduct. But if a creditor in that situation, looking only to a repayment of his advances and not to the acquisition of an interest in the profits of his debtor's business, quo profits,

takes as collateral security for his claim an assignment upon paper of the business itself in the hands of its ·proprietor, the latter's obligation to pay the whole debt remaining absolute, what possible difference can that make? The relation of principal and agent is not created by the mere existence of a trust entitling one party to profits made by another: Friedlander v. Hillcoat (Tex.), 14 S. W. Rep. 786, any more than a partnership is created between a creditor and a debtor by an agreement that the former is to receive the profits of the latter's business in reduction of the indebtedness, where the debtor is absolutely bound to refund the whole debt: Eager v. Crawford, 76 N. Y. 97; Irwin v. Bidwell, 72 Pa. 244.

The test in each case is, is the business beneficially the business of him to whom the profits are to go? and is the property from which they arise his property, by virtue either of actual ownership or of the cession to him by the actual owner of such complete dominion and control as is usually incident to ownership? See Perkins v. Huntington, supra; Poundstone v. Hamburger, 139 Pa. 319. The effect, however, of an assignment as collateral security of a contract, whose execution and the details of whose management are left in the hands of the assignor, does not come up to that test. "The use of the term collateral security, when a debtor transfers to his creditor an article of value, or an evidence of debt, is intended to express that it is not received in payment of the principal debt, and that it is not an additional right to which the creditor is absolutely entitled. It is merely a concurrent security for another debt . . . . subsidiary to the principal debt . . . . and . . . . if the principal debt be paid off the debtor is entitled to the restoration of the collateral security:" Munn v. MacDonald, 10 W. 270, per SERGEANT, J. An assignment, therefore, for collateral security, leaves the parties what they were, debtor and creditor, and does not make the assignee the owner of the thing assigned —ownership being "the right by which a thing belongs to some one in particular, to the exclusion of all other persons:" Hill v. Cumberland, etc., Co., 59 Pa. 474—but leaves the ultimate ownership of it in the assignor. That the collateral assignee of a debt, in possession and control of the evidence of it, is invested with all the rights of an owner for the purposes of collection, etc., and liable to the assignor for its loss by reason of

a negligent failure to assert those rights: Hanna v. Holton, 78 Pa. 334; Beale v. Bank, 5 W. 529, is, of course, true. But this very liability shows that he is not its absolute owner; for I cannot be held accountable to any one for the loss of that which is absolutely mine. That one who has become the ostensible proprietor of a thing, upon a secret trust to hold it merely as collateral, may be treated by third parties as its owner, Aultman's App., 98 Pa. 505, 516, is also true. But that right rests upon the equitable doctrine that he who has held himself out as the owner, with the effect of inducing others to act as if he were such in fact, is estopped from denying, to their injury, that it is the fact: Ibid. Of course there can be no such estoppel where there can have been no appearance, or even suspicion, of ownership whereby any one could have been misled: Denithorne v. Hook, 112 Pa. 240. In short, an assignee for collateral security is never the owner of the thing assigned, while his right in it is merely that of a pledgee. A contrary statement would involve contradictory propositions. He is only *treated* as its owner for the protection of the assignor or of those whom he has permitted to deal with him, or upon the faith of his holding himself out as its owner. Such equities being here out of the way, since the agreement of June 3, 1893, regarded as a present assignment for collateral security, did not, in fact, make the defendant the ultimate beneficial owner of Amweg's contract with the commissioners, nor transfer to it the execution or management of the same, how can it be said that, by force of the same, the defendant became a principal and Amweg the defendant's agent in its completion? Says O'Brien, J., in Perkins v. Huntington, supra: "To constitute one a principal with respect to the acts of another in purchasing, he must, in fact, be the purchaser and primarily interested; and the person so purchasing must be employed by him to act for him and for his benefit." A debtor, in paying off or working off his debt, acts, at least in legal acceptation, for his own benefit, and not for the benefit of his creditor. He is his own master. He is not his creditor's servant. And in legal essence there is no difference between the relation of master and servant and that of principal and agent, the terms "servant" and "agent" being fundamentally interchangeable, and the distinction between them evidential only; see the learned articles of C. C. Allen, Esq., "Servant and

Agent Essentially Identical," 28 Amer. L. R. Rev. 9, and of
Judge HOLMES, "Agency," 4 and 5 Harv. L. Rev. 345 and 1.
The relation of debtor and creditor not being changed towards
each other or towards the ultimate beneficial ownership of the
thing assigned, by its assignment as collateral security, the
debtor cannot, of course, by reason of such assignment become
his creditor's employee.   A fortiori must this be so, where the
possession and control of the thing assigned remains with the
debtor.   The fact that the extent of such an assignment is
limited by an exclusion of part of its subject-matter from its
operation—I refer to the stipulation for $50.00 per week in favor
of Amweg out of the revenues of the assigned contracts—cannot
imply the contrary effect.   It is a retention of that which be-
longs to the debtor, not a transfer to him of that which belongs
to the creditor—a reservation or exception by the former, not
an allowance or hire by the latter.

I have thus far adverted only to the agreement of June 3,
1893.   I am not unmindful of the rule that, in construing a
written contract, its effect is to be gathered not from the label
the parties chose to put upon it, nor solely from the terms of
the whole instrument, but from the real nature and character
of the transaction evidenced by all of its provisions, in the
light of the circumstances under which the parties contracted,
their situation and relations and their own acts indicative of
the effect they gave to it; see the opinion just filed in Kestner
& Lauer v. Keiser Cigar Co., C. P. Berks county, No. 159,
December term, 1893, and cases there cited.   But, in analogy
to the principle of testamentary interpretation expounded by
Mr. Justice WOODWARD in Sheetz's App., 82 Pa. 217, I take
it to be equally obvious that the plain, reasonable and lawful
meaning of a written contract, which the parties have deliber-
ately made the measure of their rights and the criterion of their
relations, and under which they profess to have acted, is not to
be overborne by evidence relating to their previous and subse-
quent acts and dealings, unless a modifying intent be deducible
therefrom with at least the same degree of clearness and cer-
tainty ; and that, if those elements are ambiguous and equivocal,
justifying either of two opposite inferences, that must be adopted
which conforms and subordinates them to the contract as it is
written.   When the agreement of June 3, 1895, was made, there

was, so far as the evidence, intrinsic or extrinsic, discloses, no
thought of Amweg's being unable to complete his contract with
the commission. On the contrary the advances made to him
by defendant were designed to enable him to do so. An abso-
lute abandonment of that contract by him to it, therefore, was
not within the contemplation of the parties, and the subsequent
absolute assignment was not in pursuance of their intention as
it then existed, even if the apparent inconsistency between an
agreement to assign as collateral and an absolute transfer could
be overlooked so as to treat them as parts of a single transac-
tion. If the absolute assignment throws any light whatever
upon the design and real nature, as understood by the parties
of the agreement to assign as collateral, its effect must be to
show that the condition of affairs as it stood a month after the
latter was executed satisfied the parties of the inadequacy of
the arrangement made, a new and unexpected necessity to take
the entire management and execution of the Wernersville con-
tract out of Amweg's hands, and that the agreement of June 3,
1893, was insufficient for that purpose, i. e., that it was not and
could not, according to the intent that gave birth to it, be treated
as an absolute transfer. If the latter was its understood effect,
why make another to the same effect? The antedating of the
absolute assignment can at most indicate a purpose to make the
new contract a substitute for the earlier one. As such, how-
ever, it never became effectual; at least never during the period
with which the plaintiff here is concerned. During that period,
at all events, nothing was done under it, no rights were ac-
quired and no liabilities incurred by virtue of it; and if there
was any fraudulent intent in the conception of it, it stopped
short of being acted out by anything operating or capable of
operating prejudicially to any one, and consequently could not
amount to a fraud in law, upon the familiar principle established
by Smith v. Smith, 21 Pa. 367 ; Bunn v. Ahl, 29 Pa. 387 ; Wil-
liams v. Davis, 69 Pa. 21, and similar cases. The subsequent
taking possession by defendant of the tools, etc., left at Werners-
ville by Amweg is equally devoid of decisive bearing upon the
intention of the parties on June 3, 1893.

It seems to have been done in pursuance of the arrangement
of defendant with the commission permitting it to take up the
unfinished work and with the acquiescence of, or at least with-

out effective resistance from, Amweg's assignee for benefit of
creditors.    It can scarcely be regarded as an act done in pursu-
ance even of the absolute assignment by Amweg to the defend-
dant, because, as I have said, that assignment was brutum
fulmen by reason of the refusal of the commission to recognize
it, and because that assignment contemplated no change in the
manager of the work, but the retention of control by Amweg
for defendant, whereas the possession taken was by another
manager, agreed upon between the defendant and the commis-
sion.    But in no event can it relate back to the agreement of
June 3, 1893, so as to show an intent then existing contrary to
its terms, or an ownership by defendant not given thereby.    If
the defendant appropriated to itself property rightfully belong-
ing to Amweg's assignee for benefit of creditors, it is not for
the plaintiff to assert another's rights.    Again, whilst it is true
that no new contracts were made by Amweg after June 3, 1893,
there is no evidence of any such made by defendant or of any
control exercised by it over those previously made by Amweg
before it took possession under authority from the commission.
The effect of the concurrence of these circumstances, if it means
anything relevant to the question of the parties' understanding
of the agreement of June 3, 1893, would seem to be that they
contemplated no change in the ownership of the contract of
July 12, 1892, or in the position of Amweg as the principal in
its execution.    Otherwise the natural and obvious thing to do
would have been to transfer existing subcontracts to defendant
(as was attempted to be done in the subsequent absolute assign-
ment) or to make new ones in its name.    Finally the circum-
stance that defendant, on June 3, 1893, was not only Amweg's
creditor, but also his surety, is of no controlling significance.
To be sure the contract of suretyship is a direct liability to one
for an act to be performed by another, the surety assuming to
perform the contract if his principal should not: Reigart v.
White, 52 Pa. 438.    But in the performance of that contract
in the first instance it does not constitute the surety the princi-
pal and the party for whom he has undertaken his agent.    The
surety for the performance of the contract does not become the
owner of the contract while the contractor continues to prose-
cute it.    The advancement of money for the carrying on of an
enterprise, to be absolutely repaid, does not make the creditor

the owner of it.   The taking of collateral security for such debt does not vest the absolute ownership of the thing assigned in the creditor.   If you add any quantity of zeros together, the result will still be zero.   Whether the taking of an assignment of a contract by one who is surety for its performance, as indemnification for his liability as such, may constitute him the principal in its further prosecution, is not the question before me.   As has been seen, the agreement of June 3, 1893, is an assignment at most as collateral for defendant's loans of money and not for its indemnification as surety; and as for the absolute assignment, the plaintiff never acquired any rights under it.   Surely one who is a surety may also be a creditor, and what he does in the one capacity has no necessary bearing on what he does in the other.   It follows that the defendant's suretyship does not affect his status under the agreement of June 3, 1893. Whatever may be its liability, directly or indirectly, to this plaintiff and others similarly situated by reason of its suretyship, that liability cannot be worked out under said agreement, nor in this action.

It follows, upon every ground, that there is no evidence here to hold the defendant to the plaintiff as an undisclosed principal.

(2) I do not propose to discuss the question of the right of one to sue another in assumpsit upon a promise made to a third. See Hind v. Holdship, 2 W. 104; Blymire v. Boistle, 6 W. 182; Morrison v. Beckey, 6 W. 341; Beers v. Robinson, 9 Pa. 229; Torrens v. Campbell, 74 Pa. 470; Kountz v. Holthouse, 85 Pa. 235; Guthrie v. Kerr, 85 Pa. 303; Adams v. Kuehn, 119 Pa. 76; Delp v. Brewing Co., 123 Pa. 42, and similar cases.   The defendant's agreement to permit the funds arising from the contracts to be applied, in the first instance, to bills payable, pay-rolls and costs of materials furnished in their prosecution, does not convey a promise to pay all such claims in full, or to make up out of its own treasury deficiencies that might still be found to exist.   Nor can a promise presently to do so be implied from the fact, doubtless known to defendant, that 20 per cent of the monthly estimates upon the Wernersville contracts were retained by the commission for the purpose above stated. So far as current disbursements were concerned, the agreement had reference only to funds actually on hand, or coming in from

time to time from the contracts mentioned in the instrument. The very purpose of the transaction, to make the surplus revenues of those contracts the means, pledged to it by way of collateral security, of reimbursement for what it had already paid out, negatives the idea that it intended to assume the duty of paying out anything more. The implication of such a promise from the absolute assignment, assuming it to have been intended as a substitute for the agreement of June 3, 1893, is precluded, if it were otherwise possible, by the fact that it did not take effect and that nothing passed to the defendant under it: see Hart v. Kelley, 83 Pa. 286.

(3) If the defendant held or received any money, either paid to or deposited with it by the commission or by Amweg, or loaned by itself to the latter and by him given to it, upon any trust to turn over to the plaintiff so much of it as his wages, accrued and to accrue, should amount to, a recovery may be had in this suit for the same as money had and received to his use: Justice v. Tallman, 86 Pa. 147; Hostetter v. Hollinger, 117 Pa. 606; Benner v. Weeks, 159 Pa. 504. But, whilst part of the money deposited and to be deposited under the agreement of June 3, 1893, was undoubtedly intended to pay the workmen and mechanics—just as it may be said that money which any person getting goods from another pays to him with whom he has contracted for them is intended to pay the workmen, etc., whose labor produced them—that could not make the money their money, nor its deposit and receipt a deposit and receipt of it to their use, in any legal sense. No portion of the $12,000 advanced or of the future revenues was set apart for the one or the other, and no preference in the order of payment in favor of wages of manual labor can be imported into the agreement by virtue of the acts of April 9, 1872, P. L. 49, and June 13, 1883, P. L. 116. I am disposed to give the principle established by those statutes the widest possible application. It is consonant with both justice and sound public policy to make the laboring man as sure of his wages as he can be made, without confiscating one man's property to pay the debts of another. That our legislation intends no such thing is clear from the decision of Mr. Justice CLARK in Hartman's App., 107 Pa. 327. The doctrine of that decision, most broadly stated, goes no further than to deny the power of any one by a trans-

fer of his property, no matter by what device, to defeat the payment of wages of labor performed for him, or to allow such an effect to his insolvency or to the accident of his death. Its application presupposes the happening of one of these two contingencies or a transfer divesting the employer of his estate. The former being out of the case, it cannot apply to any arrangement by which a solvent employer retains all the means of payment he ever had and which leaves his obligation to pay as wholly enforceable as before. By the agreement of June 3, 1893, Amweg divested himself neither of the ownership of the Wernersville contract or of any property he had in connection with it, nor of its revenues as a means of paying those toward whom he incurred obligations in its prosecution; nor could his deposit of those revenues with the defendant under said agreement prevent any such claimant from enforcing his claim. The defendant, on the other hand, had no power to dictate the application of the fund in detail, or to withhold any part of it from any one of the purposes, sanctioned by the agreement, to which Amweg might choose to apply it. It cannot, therefore, be successfully alleged, that, either by agreement or under the operation of any principle of preference known to our law, the defendant ever received from Amweg money belonging to this plaintiff or to his use. The utmost that can be claimed is that it was bound to take care that none of the funds deposited with it by Amweg were diverted to purposes other than those general ones specified in the agreement, and that, to the extent to which it neglected that duty, it might be liable to holders of claims within the purview of the agreement and remaining unpaid by reason of such diversion. Apart from the rule, that, in an action for money had and received, there can be no recovery for defendant's misconduct or negligence, Rush v. Good, 14 S. & R. 226, 230, it is a fact, that, whilst $1,000 of Amweg's deposit may have been credited upon his indebtedness to defendant, the latter, before receiving another cent from any one, had expended upon claims properly within the scope of the agreement sums vastly in excess of that amount. The money received by it in September, however, was received by it as Amweg's surety and from the commission, not as Amweg's creditor nor from him. Though probably expected to go, in part, for payment of wages, there was no trust impressed upon

it in favor of any particular person or class of persons, least of all in favor of those with whom the recipient stood in no contractual relation.

I have thus discussed every position suggested by the ingenuity of plaintiff's counsel in support of this verdict. As a result I am forced to the conclusion that judgment cannot be lawfully entered upon it, because, upon no theory, remembering the form of the action, is there any evidence to sustain it. Of course this is not a decision that the plaintiff must go without his pay.

And now, to wit, March 12, 1894, it is ordered that judgment be entered in favor of defendant, notwithstanding the verdict upon the points reserved.

### SUPPLEMENTAL OPINION OF THE COURT.

A reargument of this case was allowed to enable counsel to discuss a contention not previously made or elaborated. Plaintiff's position, upon the trial and former argument, as I understood it, upon the question of the effect of the legislation regarding liens and preferences of wages, was that, treating the agreement of June 3, 1893, as a transfer by Amweg to defendant of certain property and funds for the payment of debts arising in the course of the performance of the Wernersville contract, the principle established by the act of April 9, 1872, and its amendments imposed upon the defendant the duty of preferring, in the payment of said debts, those representing the wages of manual labor. The position now taken is that, defendant having, about August 1, 1893, taken charge of the Wernersville contract, with the materials, tools, etc., connected therewith, in pursuance of an understanding with, and by the consent of, both the commissioners and Amweg, and having, by virtue of that transfer, received from the latter certain funds allowed upon estimates of work, etc., done by Amweg previous to the transfer, section 1, of the act of 1872, as amended by the acts of June 13, 1883, and May 12, 1891, subjected all the defendant got by the transaction to a lien in favor of the plaintiff and the defendant to the duty of preferring him in the order of payments of said funds, which lien and duty, the former might enforce in this action.

The effect of the act of April 9, 1872, P. L. 47, is determined

by the decisions in Pardee's App., 100 Pa. 408 ; Gibbs & Sterrett Manufacturing Co.'s App., 100 Pa. 528 ; Llewllyn's App., 103 Pa. 458 ; Hartman's App., 107 Pa. 327 ; White's App., 15 W. N. 313. Without entering into any discussion of it, I think it may be safely said that, as originally passed, that statute would be inapplicable to this case. It was, however, amended by the act of June 13, 1883, P. L. 116, whose principal object was to extend the scope of the amended act: Sproul v. Murray, 156 Pa. 293 ; and that extension, by embracing certain classes of employees unknown to the businesses alone reached by the act of 1872, necessarily rendering inapplicable the former decisions upon the words " other business " in the original act, and made those words in the amending act to include all kinds of businesses in which any of the classes of employees enumerated in the same may be engaged: Ibid. A judicial construction of a statute being as much a part of it as the text itself, Douglass v. Pike Co., 101 U. S. 677, the act of 1883 must, to that extent, be regarded as a repeal of sec. 1, act 1872. But the act of 1883 was, in its turn, dealt with by that of May 12, 1891, P. L. 54, which, after reciting the enacting part of the former, declares that " the same is hereby amended to read as follows :

" That all moneys that may be due or hereafter become due for labor and services rendered by any . . . . mechanic . . . . from any person or persons . . . . either as owner, lessee, contractor or under-owner . . . . for any period not exceeding six months preceding the sale or transfer of the real or personal property, works, mines, manufactories or business or other property connected therewith in carrying on the same of said person or persons . . . . by execution or otherwise, on account of the death or insolvency of such employer or employers, shall be a lien upon said real or personal property, mines, manufactory, business or other property in and about, or used in carrying on said business or in connection therewith, to the extent of the interest of such employer or employers in said property, and shall be preferred and first paid out of the proceeds of the sale of such real or personal property, mines, manufactory, business or other property as aforesaid."

An amendment of a statute so as " to read as follows," etc., repeals the latter as to all matters wherein the two differ, and as to everything else merges the old law in the new, leaving the

old no vitality distinct from the new, continuing the former as
to past transactions, but as to future ones resting the whole
force of the legislation upon the amendatory statute: Moore v.
Mansert, 49 N. Y. 332; People v. Supervisors, 67 N. Y. 109;
Ely v. Holton, 15 N. Y. 595; State v. Ingersoll, 17 Wis. 651;
Goodno v. Oshkosh, 31 Wis. 127; Mosby v. Ins. Co., 31 Gratt.
(Va.), 629; Burwell v. Tullis, 12 Minn. 572; Goodall v.
People (Ill.), 12 West. Rep. 824; State v. Duval Co. (Fla.),
3 So. Rep. 193; Bish., Wr. L., sec. 152*a*.   Of course where a
statute is passed upon a subject already legislated upon it can-
not be proper to suppose that nothing new was intended,
because that would treat the enactment as a work of superero-
gation, which the legislature, knowing the existing law, Howard
Assn.'s App., 70 Pa. 344, 346, cannot be assumed to have de-
signed it to be: Pardee's App., supra, p. 412.   Again, whilst
the re-enactment of language which has received judicial con-
struction raises a presumption that it is used in the sense thus
declared, Sproul v. Murray, supra, p. 296, a departure from the
words of a prior statute upon the same subject is an intimation
that another and not the same meaning is intended to be given
to the new enactment: Rich v. Keyser, 54 Pa. 86.

Now, it will be observed, that, whilst the acts of 1872 and
1883 spoke of the sale or transfer of the employer's "works,
mines, manufactories or business or other property connected
therewith," etc., as the contingency upon which the right of
lien or preference should arise to the employee, the act of 1891
gives that right upon the sale or transfer of "the real or per-
sonal property, works, mines, manufactories or business or other
property connected therewith," etc.   The effect of this change
of phraseology is doubtless to enlarge the scope of the legisla-
tion.   An employer may be the owner of real or personal prop-
erty which cannot be classified as works, mines or manufactories,
and may not be engaged in any business.   Or the transfer may
be of his property, and not strictly speaking of his business,
which may be abandoned.   The intention to prevent a defeat
of his employees' claims for wages in either of these cases might
have been doubtful or frustrated by retaining the original
phraseology.

In the next place it is noticeable that in the acts of 1872 and
1883 the "sale or transfer by execution or otherwise" was "pre-

ceding death or insolvency;" i. e., during the employer's life-
time and solvency: Hartman's App., supra, p. 334.   In the act
of 1891 it is "on account of the death or insolvency" of the
employer; i. e., by reason of, because of the one or the other:
see Century Dictionary, adverb, Account, 8.   That by death or
insolvency is meant an accomplished, not a contemplated, event
is shown by the title, which, under our constitution, is not only
part of the statute, but an important guide to its interpretation:
Pa. R. R. Co. v. Riblet, 66 Pa. 164; Eby's App., 70 Pa. 311;
Halderman's App., 104 Pa. 251, and which speaks of employers
as "insolvent" debtors.   One is not an insolvent who merely
expects or fears or hopes to become such.   Instead, therefore,
of the sale or transfer, upon which the right of lien and prefer-
ence is to attach, preceding, as under the old law, the death or
insolvency of the employer, it must, under the act of 1891, fol-
low the one or the other, being caused or occasioned by it.   But
inasmuch as the lien does not attach until sale or transfer it
cannot be intended that there should be a lien upon any prop-
erty in the hands of the employer.   And inasmuch as the method
pointed out for the enforcement of the lien is its collection,
ahead of other claims, out of the proceeds of the sale of the
property, meaning unmistakably a sale of it by the transferee,
it is equally clear that the transfer contemplated by the statute
is not a transfer of the employer's property, etc., to one as the
absolute beneficial owner, upon present payment or promise of
payment of a full money consideration, or in discharge of an
adequate debt antecedently due him, but a transfer of property,
etc., to one for the purpose of converting it into money, or in
some way administering it for the benefit of the employer or his
creditors.   Such a transfer includes one by the employer to
assignees for benefit of creditors, or to trustees for certain pur-
poses, by the action of a court of equity to a receiver, by execu-
tion process to a sheriff or constable, by operation of law to an
administrator, and the like.   I am quite aware that this con-
struction of the act of 1891 is radically different from that
placed upon section 1, act 1872, in Hartman's App., supra.
Nor am I unmindful either of the fact that, by section 3 of that
statute, in all cases of the death, insolvency or assignment of
employers embraced by section 1 (now as amended by act 1891),
or of executions issued against them, a "lien of preference" is

enacted in favor of wages claims broader than that given by section 1 as unamended; or of the rule that a statute, when amended, is thereafter, and as to all acts subsequently done, to be construed as if the amendment had always been there: Holbrook v. Nichol, 36 Ill. 161; Turney v. Wilton, 36 Ill. 385; Kamerick v. Castleman, 21 Mo. App. 587; People v. Sweetser, 1 Dak. 308; Ludington v. U. S., 15 Ct. Cl. 453, and the amendment itself in view of the remaining original provisions: Harrell v. Harrell, 8 Fla. 46; Griffin's Case, Chase Dec. 364. But, whether it be possible to find for section 3 a reasonable field of operation distinct from that covered by section 1 as it stands since the act of 1891, or whether the latter is to be understood as intended to cover the whole ground and supersede the provisions of sections 3, the construction above indicated of the act of 1891 seems too clearly required to permit an escape from it, and is, I think, in accord with the principles announced by Mr. Justice FELL, delivering the opinion of the Supreme Court upon the very enactment in question in Wilkinson v. Patton, 162 Pa. 12, so far as I am able to gather from newspaper reports of its tenor.

I come now to the application of the statute as above construed to the present case. Whatever may be the relation of section 1, as amended, to section 3, it is perfectly clear that we are now concerned with the former only. Amweg was a contractor, i. e., he was " one who contracts or covenants, either with . . . . a public body or private parties, to . . . . construct works or erect buildings . . . . at a certain price or rate:" Cent. Dict., ad verb. That such a person is not embraced by the term "contractor" as used in this statute may be true: See Gibbs & Sterrett Manufacturing Co.'s App., supra. But what he was engaged in was certainly a " business " within the ordinary meaning of that word, viz : " any employment or occupation in which a person is engaged to procure a living," Goddard v. Chaffee, 2 Allen (Mass.), 395, embracing everything about which a man can be employed: Parker Mills v. Comm'rs, 23 N. Y. 242, and the business was his busines and he was the owner of it: See Brown's App., 111 Pa. 72, 80. The plaintiff, a carpenter, was a "mechanic," see Berks Co. v. Bertolet, 13 Pa. 522, employed in the prosecution of that business by Amweg. It follows, under the doctrine of Sproul v. Murray,

supra, p. 296, that both the plaintiff, in the respect of his employment, and Amweg, in respect of his business, were within the purview of the statute. Let it be further granted that there was a transfer of the Wernersville contract and everything relating to it to the defendant, however, and by whatever instrumentality it may have been accomplished, with the consent and co-operation of Amweg, and that that transfer was occasioned by his financial difficulties, amounting to insolvency, it cannot be accurate to say that his business was transferred to defendant. The fact is undisputed that Amweg's business embraced the prosecution of a number of contracts simultaneously with the Wernersville contract. His business as contractor was not necessarily involved in the transfer or abandonment of the latter. Nothing not connected with it went into the defendant's hands, and therefore his business did not. But "property" of his connected with that business did. The tools, etc., used at Wernersville, and now in defendant's possession, were his property. The contract of Amweg with the commissioners, his contracts with material-men, and his claim, at the date when defendant assumed control, against the commissioners for work previously done, were his property; for choses in action are property: Carlton v. Carlton, 72 Me. 115; Ide v. Harwood, 30 Minn. 195; Vaughn v. Murfreesboro, 96 N. C. 317. The credit he had with the commissioners by reason of the 20 per cent deductions retained by them upon former estimates, was his property; for a credit is property : People v. Worthington, 21 Ill. 171. All this, let it be assumed, was included in the transfer to defendant. To be sure, it did not constitute the whole of Amweg's property, nor, as I have pointed out, his "business" properly so called. But it is needless to discuss the bearing of that circumstance, because of another consideration which is controlling under the decision in Wilkinson v. Patton, supra. Whilst the transfer, keeping in view the entire transaction between Amweg and defendant, was certainly not an absolute one, intended to make the defendant the beneficial owner of everything embraced in it, it nevertheless entitled the defendant to retain so much of the property that passed into its hands as was or might be needed to discharge Amweg's indebtedness to it. For such a transfer that indebtedness was a valuable consideration, and there is nothing in the case to

show that it was not a perfectly adequate consideration or that either party was actuated by anything but perfect good faith: see Wilkinson v. Patton, supra. Just so far, therefore, as the property transferred shall be required to make the defendant whole, the purpose and effect of the transfer must be to appropriate it to the payment of defendant's claim against Amweg. To that extent, under the decision just quoted, the property cannot be subject to any lien in favor of plaintiff. And since, before completion of the work at Wernersville by defendant, it cannot be ascertained what that extent is—whether it embraces the whole, or a proportion or what proportion of the whole—it follows that the lien cannot presently attach to any part of it in the hands of the defendant. If, upon completion of the work, the defendant shall realize in excess of its claim against Amweg, it will remain liable to account to him for such excess. It would seem, however, that his contingent right to such accounting now belongs to his assignee for benefit of creditors, and that whatever lien or right of preference the plaintiff may have must attach and be worked out under that assignment. If, on the other hand, Amweg's interest in the property in the hands of defendant can be subjected to plaintiff's claim, by a proceeding against the defendant, the time, therefore, cannot arrive until it is possible to ascertain what, if anything, that interest amounts to. It may be enough to pay the plaintiff or more. It may be nothing, or, to use the common phrase, less than nothing. In either view, there can be no recovery by plaintiff in this suit, and it is unnecessary to pass upon the question whether the suit would otherwise lie.

And now, to wit, June 4, 1894, the order of March 12, 1894, making absolute the rule to show cause is reinstated, and it is now ordered that judgment be entered in favor of defendant, notwithstanding the verdict upon the points reserved.

*Error assigned* was in entering judgment for defendant non obstante veredicto.

*Henry D. Green, Herbert R. Green* and *Isaac Hiester* with him, for appellant.—The assignment of a security to a creditor to hold as collateral security for his debt establishes a privity of contract which invests him with the ownership of the collat-

eral for all purposes of dominion of the debt assigned: Hanna v. Holton, 78 Pa. 334; Beale v. The Bank, 5 Watts, 529; Meigs v. Lewis, 164 Pa. 597.

To Amweg, the defendant assumed the duty of carrying on the work; and to subcontractors, it assumed the duty of paying for materials and labor thereafter furnished: Faull v. Tinsman, 36 Pa. 108; Mangles v. Dixon, 3 H. L. 703.

Whenever the consideration moves from a party, though the promise is made to another, yet he from whom the consideration moves may be plaintiff: Comfort v. Eisenbeis, 11 Pa. 16; Edmundson v. Penny, 1 Pa. 334; Campbell v. Lacock, 40 Pa. 451.

That assumpsit may be maintained under these circumstances, irrespective of the fact that the plaintiff is a party to the consideration if not to the contract, is sufficiently ruled in Hinds v. Holdship, 2 Watts, 104; Blymire v. Boistle, 6 Watts, 182; Beers v. Robinson, 9 Pa. 229; Justice v. Tallman, 86 Pa. 147; Vincent v. Watson, 18 Pa. 96; Townsend v. Long, 77 Pa. 143.

The collateral agreement was in fact an assignment: 1 Am. & Eng. Ency. of Law, 834; Townsend v. Windham, 2 Vesey, 7; Collins's App., 107 Pa. 590; Lant's App., 95 Pa. 279; Leslie v. Glass, Campbell's Taney Decisions, 422; Dusenbery v. Speir, 77 N. Y. 144; First Baptist Church v. Caughey, 85 Pa. 271; Hertzog v. Hertzog, 29 Pa. 465.

There was a statutory lien for wages: Act of April 9, 1872, P. L. 47; Act of May 12, 1891, P. L. 54; 2 Blackstone's Com., 512.

*Jefferson Snyder*, of *Baer & Snyder*, *Philip S. Zieber* with him, for appellee.—Since the decision of this court in Wilkinson, Assignee, v. Patton, 162 Pa. 12, the heart is taken out of the contentions of the appellant in the present case.

The plaintiff is not a party to the contract in our case and there are no equities of his to which the assignment is subject.

PER CURIAM, March 27, 1896:

We are entirely satisfied with the conclusions reached by the learned court below. The very able and exhaustive opinion filed vindicates the correctness of the decision and we affirm the judgment substantially for the reasons there stated.